## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

RESTORE MEDIA, LLC,                              :
1000 Potomac Street, NW, Suite 102              :
Washington, DC 20007,                            :
                                                 :
      Plaintiff,    :
                                                 :
v.                                               :
                                                 :
ROLAND A. LABINE                                 :
199 Berkeley Place                               :
Brooklyn, NY 11217,                              :
                                                 :    Case No. _____
JOHN M. CORBETT, JR.                            :
235 State Street                                 :
Northampton, MA 01060,                           :
                                                 :
and                                              :
                                                 :
MEETINGHOUSE ENTERPRISES, INC.                   :
Registered Agent- John M. Corbett, Jr.           :
One Ferry Street                                 :
Easthampton, MA 01027,                           :
                                                 :
      Defendants.   :

## VERIFIED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF
### (Jury Trial Demanded)

Plaintiff, Restore Media, LLC ("Restore Media"), by its attorneys, file this Verified Complaint for Injunctive and Other Relief against Roland A. Labine ("Labine"), John Corbett ("Corbett"), and Meetinghouse Enterprises, Inc. ("Meetinghouse"), also known as Meetinghouse Research Group, Inc., (collectively "Defendants"), for breach of contract and tortious interference with contract, and in support thereof, states as follows:

### Nature of the Case

1.     This is an action to enforce a restrictive covenant in an Employment Agreement between Restore Media and its former employee, Labine. In a blatant and open breach of his

Employment Agreement with Restore Media, Labine, with Corbett and Meetinghouse, is developing an on-line catalog of restoration vendors, to compete directly with Restore Media in the business of providing a web-based resource for restoration and renovation services and companies.

2.      Unless enjoined by the Court, Defendants will continue to violate Restore Media's contractual and common law rights and cause irreparable injury to Restore Media's business.  In addition to the entry of a judgment in its favor as to all counts alleged herein, Restore Media seeks the entry of a preliminary and permanent injunction order enjoining Labine from continuing to breach his restrictive covenants.

**The Parties**

3.      Restore Media is a Delaware limited liability company with its principal place of business located at 1000 Potomac Street, NW, Suite 102, Washington, DC 20007.

4.      Labine is an individual who resides and works in New York.

5.      Corbett is an individual who resides and works in Massachusetts.

6.      Meetinghouse is a Massachusetts corporation with its principal place of business in Massachusetts.  Meetinghouse operates as Meetinghouse Research Group, Inc., through its website.

**Jurisdiction and Venue**

7.      This Court has jurisdiction over the parties to this action pursuant to 28 U.S.C. § 1332 (a)(1) as the parties are all citizens of different states and the matter in controversy exceeds the sum or value of $75,000.

8.      This Court has jurisdiction over Defendants to this action pursuant to D.C. Code § 13-423 as the claims in this lawsuit arise from Defendants' actions in the District of Columbia.

9.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a)(2), as a substantial portion of the events or omissions giving rise to the claim occurred in this judicial district.

### Facts Common to All Counts

10.    Restore Media provides information to people who restore and renovate old homes and non-residential buildings or who create new buildings in a traditional style, regarding the entire restoration and renovation market through its publications, trade shows, conferences, and Internet initiatives.

11.    As part of its services, Restore Media maintains an on-line catalog of vendors and experts in the restoration and renovation market called TradWebDirectory.com.  A significant part of its revenue is generated from advertising in its on-line catalogue by these vendors and experts.

12.    Restore Media's customers, advertisers, and vendors are located throughout the United States.

13.    On March 1, 2002, Restore Media purchased from Historical Trends Corporation, which was and is owned and controlled by Labine, two publications called *Clem Labine's Traditional Building* and *Clem Labine's Period Homes* ("Publications"), and two websites traditional-building.com and period-homes.com, for $1,355,000.  *See* Asset and Liabilities Purchase Agreement, attached as Exhibit A.

14.    As a condition of that sale, Labine was required to sign an Employment Agreement. *See id.* at Paragraph 4.2.2.  Restore Media hired Labine as the Publisher and Editor, Marketing and Circulation Director, and Database Manager and Systems Guy for the Publications.  *See* Employment Agreement, attached as Exhibit B.

15.     In this Employment Agreement, Paragraph 8(a), Labine agreed that, for a period of three years after his employment, he would not:

- "engage in, or in any manner be connected or concerned with, directly or indirectly, as principal, agent, employee, officer, consultant, advisor or owner of any business operation engaged in the historic restoration market, including, without limitation any and all publications, other media and trade shows in such market";

- "directly or indirectly solicit any customer, subscriber, advertiser or vendor of the Company or the Publications to cease or reduce its business with the Company or the Publications"; or

- "divert from the Company any business opportunity relating to publications, media or trade shows in the historic restoration market."

16.     Moreover, Labine agreed that "[d]uring the term of this Agreement and following the termination of this Agreement, whether terminated by the Company or Employee, Employee shall not make any use, for his own benefit or for the benefit of any person, firm, business, or entity (other than the Company) of any 'Confidential Information' or knowledge, customer or supplier lists, or any other data of or pertaining to the Company or the Publications . . . ." *See id.* at Paragraph 8(b)(i) (emphasis added).

17.     All tolled, Labine received approximately $1.6 million in salary and purchase proceeds in exchange for his publications, services, and restrictive covenants.

18.     On December 31, 2003, Restore Media purchased the assets of Preservation Publications, LLC, for $276,565. The assets included three regional print directories of the Preservation Sourcebook and a companion website, presevationweb.com, which Restore Media has transitioned into its own directory, TradWebDirectory.com.

19.     During his employment with Restore Media, and particularly in the last few months of his employment, Labine focused his efforts on developing and establishing the TradWebDirectory.com website.

20.    Labine resigned his employment with Restore Media on July 31, 2006. Upon his departure, Labine kept Restore Media's confidential and proprietary databases containing customer and company information on his personal computer.

21.    Corbett owns and controls Meetinghouse, which operates as Meetinghouse Research Group, Inc., through its website. As part of his business, Corbett was a consultant to Restore Media from January 1, 2006, until November 2006. During that time, Corbett worked primarily with Labine on developing and establishing TradWebDirectory.com.

22.    Corbett and Labine were privy to all of Restore Media's confidential and proprietary plans for launching TradWebDirectory.com, including, but not limited to its market strategy, pricing, and philosophy, and Restore Media's database of customers and providers.

23.    On January 5, 2007, Labine sent an letter to Restore Media's clients regarding "Clem's Personal Business News for 2007," announcing the termination of his employment with Restore Media and his plans for an exciting, innovative business plans for the market. *See* Exhibit C.

24.    On January 11, 2007, Labine sent a proposal to Corbett for establishing and developing an on-line catalog of restoration and renovation vendors under the company Restoration Trades Exchange ("RTE"), attached as Exhibit D. Labine provided an initial investment of $3,500 for Corbett and Meetinghouse to implement, with the services of an individual named David Caputo, an online version of the RTE catalog during the first quarter of 2007. Labine also proposed to participate in future development of an upgraded version of the RTE catalog.

25.    Recognizing the fact that this new venture would directly compete with Restore Media's TradWebDirectory.com and evidencing Labine's intent to harm Restore Media, Labine

stated that the RTE catalog "will be of immediate benefit in our ongoing collective efforts to stick a large thumb in MJT's eye!" *See* Exhibit D at 1. "MJT" refers to Michael J. Tucker, Chairman and Chief Executive Officer of Restore Media.

26.    Labine ends the letter by stating that Labine and Corbett's motto for 2007 is "LET'S GIVE PARANOIDS SOMETHING TO BE PARANOID ABOUT!" *See id.*

27.    Caputo has registered, on behalf of Defendants, the websites restorationtradesexchange.com and restoration-trades-exchange.com. *See* Registration Records, attached as Exhibit E.

28.    Pursuant to the terms of the January 11, 2007, letter, Labine is planning to use his industry experience to compete directly with Restore Media by marketing his new competitive business venture to Restore Media's customers, advertisers, and vendors.

29.    On March 12, 2007, counsel for Restore Media sent a letter to Labine, with a copy to Corbett's counsel, attempting to resolve the dispute, attached as Exhibit F. As of the date of the filing of this Complaint, Restore Media has received no response whatsoever to this letter.

**COUNT I**
**(Breach of Contract by Labine)**

30.    Restore Media realleges and restates paragraphs 1 - 29 as if fully restated herein.

31.    The Employment Agreement is a valid and enforceable contract.

32.    Restore Media performed all of its obligations under the Employment Agreement.

33.    Labine has intentionally breached the Employment Agreement by funding and working with Corbett and Meetinghouse to establish an on-line catalog of restoration and renovation vendors to compete with Restore Media's TradWebDirectory.com catalog.

34.    Labine continues to violate the terms of the Employment Agreement by continuing his involvement with the development of this on-line catalog in direct competition with Restore Media.

35.    Labine's letter has expressed his intent to use his knowledge of the industry and Restore Media's business strategies to compete for and to solicit Restore Media's customers, advertisers, and vendors in violation of the Employment Agreement.

36.    Labine has retained Restore Media's confidential subscriber databases on his personal computer.

37.    Labine's activities jeopardize the goodwill that Restore Media has developed with its customers and provides Labine with an unfair competitive advantage.

38.    Restore Media has no adequate remedy at law and will suffer irreparable harm unless Labine's activities are enjoined by the Court.

### COUNT II
### (Tortious Interference with Contract by Corbett and Meetinghouse)

39.    Restore Media realleges and restates paragraphs 1 - 38 as if fully restated herein.

40.    The Employment Agreement is a valid and enforceable contract.

41.    Corbett and Meetinghouse are aware of the Employment Agreement and the restrictive covenants contained therein.

42.    Corbett and Meetinghouse have intentionally and willfully interfered with Restore Media's rights under the Employment Agreement by inducing, aiding and abetting Labine to breach the Employment Agreement.

43.    Restore Media has been harmed and likely will suffer further harm because of Corbett and Meetinghouse's conduct.

## COUNT III
### (Injunctive Relief against Labine)

44.     Restore Media realleges and restates paragraphs 1 - 44 as if fully restated herein.

45.     Labine continues to wrongfully compete against Restore Media in violation of his Employment Agreement.

46.     Upon information and belief, Labine will solicit Restore Media's customers to further his anti-competitive endeavors which is a separate violation of his Employment Agreement.

47.     Labine has also wrongfully retained confidential information of Restore Media in the form of the confidential and proprietary customer and company databases on his personal computer after he resigned from Restore Media.

48.     Restore Media's damages cannot be adequately recompensed solely by monetary damages.

49.     Injunctive relief is appropriate to enjoin the efforts by Labine to breach his Employment Agreement.  All of the elements supporting an injunction are present, as follows:

      a.      Restore Media will likely succeed on the merits;

      b.      Restore Media will suffer irreparable injury if Labine's efforts are not enjoined;

      c.      No substantial harm will befall the Labine, or any other interested parties, if an injunction is ordered; and

      d.      The public interest would be served by issuance of the injunction.

WHEREFORE, Restore Media requests that this Court award the following relief:

      a.      A preliminary and/or permanent injunction(s) against Labine and his agents, servants, employees, attorneys, and those persons with whom he is in active

concert or participation from engaging in, or in any manner be connected or concerned with, directly or indirectly, as principal, agent, employee, officer, consultant, advisor or owner of any business operation engaged in the historic restoration market, including, without limitation any and all publication, other media and trade shows in such market, until July 31, 2009;

b.    A preliminary and/or permanent injunction(s) against Labine and his agents, servants, employees, attorneys, and those persons with whom he is in active concert or participation from soliciting any customer, subscriber, advertiser or vendor of the Company or the Publications to cease or reduce its business with the Company or the Publications, until July 31, 2009;

c.    A preliminary and/or permanent injunction(s) against Labine from diverting from the Company any business opportunity relating to publications, media or trade shows in the historic restoration market, until July 31, 2009;

d.    A preliminary and/or permanent injunction(s) against Labine from using, for his own benefit or for the benefit of any person, firm, business, or entity (other than the Company) of any "Confidential Information" or knowledge, customer or supplier lists, or any other data of or pertaining to the Company or the Publications;

e.    A preliminary injunction against Labine requiring the return of Restore Media's "Confidential Information" or knowledge, customer or supplier lists, or any other data of or pertaining to the Company or the Publications;

f.    Compensatory damages and punitive damages;

g.    Costs; and

h.    Such further relief as this Court deems just and proper.

## JURY DEMAND

Restore Media demands a jury for all issues so triable.

## **VERIFICATION**

I, Michael J. Tucker, being duly sworn, depose and state that I am the Chairman and Chief Executive Officer of Plaintiff Restore Media, LLC; that I have read the foregoing complaint; that I am familiar with the facts stated therein, and that the facts are true to the best of my knowledge, information and belief.

_____
Michael J. Tucker

Sworn to and subscribed before me this _22nd_ day of March, 2007

_____
Notary Public

PAMELA E. GERMAS
Notary Public, District of Columbia
My Commission Expires August 14, 2008

Respectfully submitted,

M. Carter DeLorme (Bar No. 452791)
Gina M. Del Negro (Bar No. 468920)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, DC  20006
(202) 282-5000
(202) 282-5100 (fax)

Attorneys for Plaintiff Restore Media, LLC

DC:504254.3

## ASSET AND LIABILITIES PURCHASE AGREEMENT

THIS ASSET AND LIABILITIES PURCHASE AGREEMENT (the "Agreement"), made this 1st day of March , 2002, by and between HISTORICAL TRENDS CORPORATION, a New York corporation ("Seller"), and RESTORE MEDIA II, LLC, a Delaware limited liability company ("Buyer").

## RECITALS

A.   Seller owns and operates *Clem Labine's Traditional Building* and *Clem Labine's Period Homes* (the "Publications").

B.   Seller desires to sell, and Buyer desires to purchase, the Publications, including related assets and certain liabilities as set forth below.

NOW, THEREFORE, Seller and Buyer agree as follows:

## ARTICLE 1

## Definitions; Purchase and Sale of Publications

1.1     Definitions.  For purposes of this Agreement certain terms shall have the meanings set forth in Schedule 1.1.

1.2     Agreement to Purchase Assets.  Subject to the provisions of this Agreement, on the Closing Date, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase and acquire from Seller, a portion of the assets and business of Seller consisting of the assets set forth on Schedule 1.2 (the "Assets"), free and clear of all liens, charges, leases, restrictions, encumbrances, pledges, covenants, attachments, security interests, tax claims and liabilities of any kind (collectively, "Liens").

1.3     Liabilities.  Buyer shall assume, and Seller shall assign, all liabilities of Seller which have been disclosed to Buyer and which are set forth on Schedule 1.3 (the "Liabilities"), including, without limitation, Seller's obligations to Mack Printing as set forth thereon.  Buyer shall not assume any other of Seller's liabilities or obligations which are unknown to Buyer, and Buyer shall assume the liabilities under any contracts and leases specifically assumed by Buyer under this Agreement.

1.4     Purchase Price; Holdback  The Purchase Price of the Assets shall be One Million Three Hundred and Fifty-Five Thousand Dollars ($1,355,000) (the "Purchase Price").  At the Closing, Buyer shall withhold One Hundred Thousand Dollars ($100,000)

from the Purchase Price in support of Seller's indemnification obligations hereunder (the "Holdback Amount"). No later than the first anniversary of the Closing Date, Buyer shall release to Seller the Holdback Amount, less the aggregate amount, if any, of any funds applied to Seller's indemnification obligations pursuant to Article VI. In the event of any dispute arising under this Section 1.4, such dispute shall be settled through arbitration in accordance with the rules of the American Arbitration Association. The venue for such arbitration shall be Kings County, New York.

1.5    Allocation of Purchase Price. The Purchase Price shall be allocated for tax purposes among the Assets (including the assumed liabilities) in accordance with allocation set forth at Schedule 1.5, which the parties shall use their best efforts to agree upon and complete within ninety (90) days of the Closing Date. Buyer shall file IRS Form 8594 with its federal income tax return consistent with such allocation for the tax year in which this Agreement is executed, and Seller and Buyer shall report all tax consequences of the transactions contemplated by this Agreement in a manner consistent with such allocation and not take any position inconsistent with such position on examination of any tax return, in any refund claim, in any litigation or investigation or otherwise.

1.6    Employee Relations and Benefits. Buyer agrees to offer employment to each of Seller's current employees ( excepting Judith Lief. ) Schedule 1.6 sets forth the current annual salaries of such employees, along with the formulas for calculating the commissions of sales persons. Such salaries, as well as commissions calculated in accordance with such formulas, shall be payable for a twelve (12) month "safe period" from the Closing Date; provided, however, that Buyer reserves the right to terminate any employee at any time for "cause." As used in this Section 1.6, "cause" shall mean any act, omission or pattern of conduct constituting fraud, dishonesty, or illegality, unexcused absenteeism, unsatisfactory performance or nonperformance. Except as provided herein, Buyer shall not assume, and Seller shall not assign, any employment contracts, wage rates, health, pension or welfare benefit plans, or any other employment-related arrangements to which Seller is or has been a party, provided, however, that Buyer agrees to assume the accrued vacation liabilities of the employees as set forth on Schedule 1.3.

1.7    Closing. The closing of the purchase contemplated by this Agreement (the "Closing") shall take place on [February 28, 2002], or such other date as the parties may mutually agree in writing, provided the conditions precedent to Closing set forth in Article 4 have been satisfied by both Seller and Buyer.

## ARTICLE 2

## Representations and Warranties of Seller

Seller hereby represents and warrants to Buyer, as of the date hereof, as follows:

2.1    Seller's Organization; Authority; Absence of Conflicts.

- 2 -

2.1.1    Seller is a corporation duly organized, validly existing, and in good standing under the laws of the State of New York. Seller has the requisite power and authority to own and operate its properties and to carry on its business as now being conducted. A true and correct copy of the Certificate of Incorporation and all amendments thereto of Seller is attached as Schedule 2.1.1.

2.1.2    The execution, delivery and performance of this Agreement and all other agreements and certificates contemplated by this Agreement (collectively, the "Related Instruments") (i) have been duly authorized by the shareholders and directors of Seller, and no further corporate action is necessary for Seller to enter into the Agreement and the Related Instruments and to consummate the transactions contemplated hereby; (ii) will not violate any provision of the Certificate of Incorporation or Bylaws of Seller; and (iii) will not violate, conflict with, cause the termination of, or otherwise give any other contracting party the legal right to terminate, or constitute a breach or default under the terms of any agreement or instrument to which Seller is a party or by or to which it may be subject or affected or any applicable statute, law, regulation or rule. This Agreement and the Related Instruments constitute the legal, valid and binding obligations of Seller, enforceable against it in accordance with their respective terms, subject to applicable bankruptcy or other similar laws of general application relating to or affecting the enforcement of creditor's rights.

2.1.3    Buyer and Seller have negotiated in good faith to conclude the transactions contemplated herein and have used their respective best efforts to exchange full and accurate information about Seller's business, the Publications, the Assets, and the Liabilities, including, without limitation, the matters which are the subject of Seller's representations and warranties set forth in this Article 2.

2.2    Representations Relating to the Assets.

2.2.1    Material Agreements.    Schedule 2.2.1 lists all agreements that are necessary for the operation of the Publications and that are being transferred and assigned hereunder, which are the valid and binding obligations of Seller, enforceable against it in accordance with their respective terms subject to applicable bankruptcy or other similar laws of general application relating to or affecting the enforcement of creditor's rights and subject to the availability of equitable remedies. Seller is not in default under or in breach of any such contract or agreement.

2.2.2    Liens.    Seller has good and marketable title to the Assets, which are free and clear of all Liens.

2.2.3    Records and Financial Statements; Absence of Material Adverse Changes.    All material transactions to date relating to the Assets to which Seller is or has been a party or in which it is or has been otherwise involved have been fairly reflected in its financial records or other appropriate corporate books and records, as appropriate. Seller's internally prepared financial statements relating to the Publications for the [twelve month periods ended December 31, 2000 and for the ten months ended October 31, 2001], (the "Financial Statements"), all of which have been delivered to Buyer,

- 3 -

present fairly the financial position of the Assets and Liabilities at their respective dates and for the respective periods covered thereby.

2.2.4  <u>Absence of Undisclosed Liabilities</u>.  Except to the extent reflected or reserved against in its Financial Statements or set forth in <u>Schedule 1.3</u>, Seller has no liabilities of any nature, whether accrued, absolute, contingent or otherwise, which could, in the aggregate, materially adversely affect the business of Seller related to the Assets. Since [October 31, 2001], there has been no material adverse change in the business, assets or condition, financial or otherwise or operations of Seller as they relate to the Publications; neither the business, condition, or operations of Seller as they relate to the Assets nor any of the Assets have been materially adversely affected as the result of any legislative or regulatory change, any revocation or change in any license or right to do business, or any other event or occurrence, whether or not insured against; and Seller has not (i) mortgaged, pledged or otherwise subjected to a Lien any of the Assets, tangible or intangible; (ii) sold, assigned or transferred any of the tangible Assets or forgiven or canceled any debts or related claims, or waived any rights with respect thereto, except in each case in the ordinary course of business at prices not less than those which it reasonably believed to be the then prevailing market prices; (iii) sold, assigned, transferred or granted any proprietary or other rights in any Domain Names, patents, trademarks, trade names, copyrights, licenses or applications for any thereof included in the Assets, or any other intangible Assets; (iv) defaulted in any material respect in the performance of any contract or other obligation with respect to the Assets; (v) increased the compensation of any person providing services to Seller with respect to the Publications; or (vi) entered into any transaction with respect to the Assets other than in the ordinary course of business.

2.2.5  <u>Filing of Tax Returns and Payment of Taxes</u>.  Seller has accurately prepared in all material respects, and timely filed, all federal, state and local tax returns (whether relating to income, sales, franchise, real or personal property, withholding, FICA and unemployment taxes or other types of taxes) required by law to be filed by it related to the Assets and has either paid or properly accrued for all taxes, interest, assessments, penalties or charges related to the Assets which have become due pursuant to such returns. There is no pending or threatened claim against Seller for payment of additional taxes related to the Assets for any period prior to the date of this Agreement in excess of the provisions referred to in the previous sentence.

2.2.6  <u>Compliance with Laws; No Consents Required</u>.  Seller is in material compliance with all applicable laws, rules, regulations, ordinances and standards of all federal, state, local and foreign authorities or agencies, where such failure to comply would have a material adverse effect on the Assets.  No third parties possess any rights of first refusal, options or similar rights with respect to the transaction contemplated in this Agreement.

2.2.7  <u>Employee Benefit Plans</u>.  Except as set forth in <u>Schedule 2.2.7</u>, no employee benefit plan of the Seller exists or has ever existed nor has Seller or any ERISA Affiliate thereof in the last five (5) years contributed or been required to contribute to a multiemployer plan as defined in Section 3(37) or an employee pension benefit plan as

- 4 -

defined in Section 3(2) of ERISA.  Neither Seller nor any ERISA Affiliate has any asserted contingent liability with respect to any disability (long or short term), hospitalization, medical, dental or life insurance plan (whether insured, partially insured, or self-insured) or other employee welfare benefit plan as defined in Section 3(1) of ERISA other than liability for health plan continuation coverage described in Part 6 of Title I of ERISA.  Each employee benefit plan has been maintained at all times in compliance with the laws applicable to it, including ERISA and the Code.  For purposes of this Section 3.8, "employee benefit plan" includes each arrangement so described in Section 3(3) of ERISA.

2.2.8  <u>Litigation</u>.  There is no action, suit, decree, arbitration, other litigation or governmental proceeding or investigation pending or threatened against Seller affecting the Assets, nor has there occurred any event nor does there exist any condition on the basis of which any such action, suit, arbitration, other litigation, proceeding or investigation might properly be instituted.  Seller is not in default with respect to any order, writ, injunction, decree, ruling or decision of any court, commission, board or other government agency relating to the Assets.

2.2.9  <u>Labor Disputes</u>.  Seller is not a party to any contract with any labor organization affecting the Publications, nor has Seller been requested by any labor organization to recognize such labor organization as the bargaining representative for any bargaining unit of any employees of Seller, nor has any labor organization been certified as representing any bargaining unit of any of the employees of Seller.  Seller does not have any knowledge of any organizational effort currently being made or threatened by or on behalf of any labor organization with respect to employees of the Publications.  There is neither pending nor threatened any labor dispute, strike or work stoppage which affects or which may affect the Publications or which may interfere with the continued operation of the Publications by Buyer after the Closing.

2.2.10  <u>Conflict of Interest</u>.  Except for directly or indirectly holding less than five percent (5%) of the outstanding shares of stock in a company which is publicly traded, none of Seller's shareholders, directors or officers knowingly owns, directly or indirectly, individually or collectively, an interest in any entity which is a competitor, of the Publications.

2.2.11  <u>Intellectual Property</u>.  <u>Schedule 2.2.11</u> is a true and complete list of all domain names, copyrights, trademarks, trade names, service marks, patents, logos and other similar intangible property rights and interests applied for, issued to or owned by Seller, if any, or under which Seller is licensed, and used in the operations of the Publications (collectively, the "<u>Intellectual Property</u>").  Seller has all right, title and interest in and to the Intellectual Property, and such Intellectual Property does not infringe or otherwise violate the intellectual property rights of any third party.

2.2.12  <u>Completeness and Accuracy of Representations and Exhibits</u>.  No representation or warranty made by Seller in this Agreement or the Related Instruments or in the exhibits and schedules to this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements made not

misleading. All exhibits and schedules and the certificates and Financial Statements given hereunder to Buyer by Seller are true, correct and complete in all material respects.

## ARTICLE 3

### Representations and Warranties of Buyer

Buyer hereby represents and warrants to Seller as of the date hereof, as follows:

3.1     Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Delaware. Buyer has the requisite power and authority to own and operate its properties and to carry on its business as now being conducted. A true and correct copy of Buyer's Certificate of Organization and all amendments thereto is attached as Schedule 3.1.

3.2     The execution, delivery and performance of this Agreement and the Related Instruments (i) have been duly authorized by the members of Buyer, and no further action is necessary for Buyer to enter into the Agreement and the Related Instruments and to consummate the transactions contemplated hereby; (ii) will not violate any provision of the Certificate of Organization of Buyer; and (iii) will not violate, conflict with, cause the termination of, or otherwise give any other contracting party the legal right to terminate, or constitute a breach or default under the terms of any agreement or instrument to which Buyer is a party or by or to which it may be subject or affected or any applicable statute, law, regulation or rule. This Agreement and the Related Instruments constitute the legal, valid and binding obligations of Buyer, enforceable against it in accordance with their respective terms, subject to applicable bankruptcy or other similar laws of general application relating to or affecting the enforcement of creditor's rights.

## ARTICLE 4

### Conditions Precedent; Pre-Closing Obligations

4.1     Conditions Precedent to Buyer Obligation. The obligation of Buyer to purchase the Assets and to assume the Liabilities and to close the transactions contemplated by this Agreement is subject to the fulfillment at or prior to the Closing of each of the following conditions:

4.1.1     Representations, Warranties and Covenants. All representations, warranties and covenants of Seller contained in this Agreement shall have been true, complete and accurate in all material respects when made and shall be true, complete and accurate in all material respects at and as of the Closing Date, and Seller shall not be in breach of or default under any of the provisions of this Agreement at the Closing Date.

- 6 -

4.1.2 <u>Due Diligence Review</u>. Buyer shall have conducted and completed a financial, legal, facilities, human resources and general business review of Seller and shall not have discovered any material adverse conditions or liabilities not disclosed by Seller to Buyer in this Agreement and the Related Instruments.

4.1.3 <u>Assets</u>. The Assets shall be free and clear of all Liens.

4.1.4 <u>Actions to be Taken by Seller at the Closing</u>. Buyer shall have received from Seller the following documents:

(a) A certificate of good standing from the State of New York.

(b) Any and all instruments as may be necessary to transfer the Assets, including without limitation, assignments of contracts.

(c) The Employment Agreement executed by Roland A. Labine in the form set forth at <u>Schedule 4.2.2</u>.

(d) A Cross-Receipt acknowledging receipt of the Purchase Price (less the Holdback Amount) from Buyer.

4.1.5 <u>Waiver</u>. Nothing in this Agreement shall prohibit Buyer, in its sole discretion, from waiving compliance with any condition of the Closing.

4.2 <u>Conditions Precedent to Seller's Obligation</u>. The obligation of Seller to consummate the sale of the Assets and to close the transactions contemplated by this Agreement is subject to the fulfillment at or prior to the Closing of the following conditions precedent set forth in this Section 4.2:

4.2.1 <u>Representations, Warranties and Covenants</u>. All representations, warranties and covenants of Buyer contained in this Agreement shall have been true, complete and accurate in all material respects when made and shall be true, complete and accurate in all material respects at and as of the Closing Date, and Buyer shall not be in breach of or default under any of the provisions of this Agreement at the Closing.

4.2.2 <u>Employment Agreement</u>. Buyer shall have entered into the Employment Agreement with Roland A. Labine set forth at <u>Schedule 4.2.2</u>.

4.2.3 <u>Lease</u>. Buyer shall have entered into the Lease with 69A Seventh Avenue Corp. for the rental of the premises at 69 A Seventh Avenue, Brooklyn, New York, set forth at <u>Schedule 4.2.3</u>.

4.2.4 <u>Actions to be Taken by Buyer at the Closing</u>. Buyer shall have delivered to Seller at the Closing the following documents and shall have taken the following actions:

(a) A certified copy of Buyer's Certificate of Organization on file with the State of Delaware, as required in Section 3.1.

- 7 -

(b)    Payment of the Purchase Price, less the Holdback Amount.

(c)    The Employment Agreement executed by Buyer.

(d)    A Cross-Receipt acknowledging receipt of the Assets and Liabilities by Buyer.

4.2.5    Waiver. Nothing in this Agreement shall prohibit Seller, in its sole discretion, from waiving compliance with any condition of the Closing.

# ARTICLE 5

## Discontinuance of Publication Names

Immediately after the Closing, Seller shall discontinue using the names "Clem Labine's Traditional Building", "Clem Labine's Period Homes" or any variations thereof.

# ARTICLE 6

## Survival of Representations

## Warranties and Agreements; Indemnification

6.1    Indemnification by Seller. Promptly upon demand, Seller shall defend, indemnify, and hold harmless Buyer from and against any and all costs or expenses, losses, damages, claims or deficiencies arising from

(i)    the assertion against Buyer or its successors and assigns of any claim for the payment or performance of any and all obligations or liabilities of Seller, of each and every nature whatsoever, arising from or applicable to any period prior to the Closing; or

(ii)    any misrepresentation or omission, breach of warranty or non-fulfillment of any covenant, condition, or agreement of Seller contained in this Agreement or in any Related Instruments furnished or to be furnished to Buyer in connection with the transactions contemplated herein.

6.2    Indemnification by Buyer. Promptly upon demand, Buyer shall defend, indemnify and hold harmless Seller from and against any and all costs or expenses, losses, damages, claims or deficiencies arising out of relating to or resulting from:

(i)    the assertion against Seller or its successors and assigns of any claim for the payment or performance of any and all obligations or liabilities of Buyer, of each and every nature whatsoever, arising from or applicable to any period after the Closing; or

(ii)    any misrepresentation, breach of warranty or non-fulfillment of any covenant, condition, or agreement of Buyer contained in this Agreement or in any Related Instruments furnished or to be furnished to Seller by Buyer in connection with the transactions contemplated herein.

6.3    Notice of Claim.   In the event that any claim is asserted against a party which would give rise to a right of indemnification, such party shall give the other party (or parties) prompt written notice of such claim, and the other party (or parties) shall have the right at its (or their) own expense to contest such claim.

6.4    Survival of Representations, Warranties and Indemnities.    All representations, warranties and indemnities in this Agreement and in any Related Instruments delivered with or pursuant to the terms of this Agreement, shall be deemed to be material and to have been relied upon by the recipient party, notwithstanding any investigation which may have been made and shall survive until the fourth anniversary of the Closing Date, except that any representation, warranty or indemnity relating to any tax returns made by Seller shall extend until the expiration of the applicable statutory period of limitations for the payment of such taxes.


## ARTICLE 7

### Expenses, Fees and Taxes;  Bulk Transfer

Each of the parties shall pay its own expenses incidental to the preparation and carrying out of this Agreement, whether or not the transactions contemplated hereby shall be consummated.


## ARTICLE 8

### Miscellaneous Provisions

8.1    Brokers.  Seller and Buyer represent and warrant each to each other that the transactions contemplated in this Agreement have been carried on in such manner as not to give rise to any claim against any party for a brokerage commission, finder's fee or other like payment, and each party agrees to indemnify and hold the other harmless from and against any such claim for brokerage commissions or finder's fees. Such indemnity shall include the cost of reasonable counsel fees in connection with the defense of any such claim.

8.2    Further Assurances.  Buyer and Seller shall from time to time execute and deliver such other instruments of conveyance and transfer and take such other actions as may reasonably be requested by each other in order to more effectively consummate the transactions contemplated hereby, and to vest in Buyer, good and marketable title to the Assets being transferred hereunder.

- 9 -

8.3    <u>Successors and Assigns</u>.  This Agreement may not be assigned by Seller or Buyer without the express prior written consent of the other party.  The Agreement shall be binding upon and inure to the benefit of and be enforceable by the successors and permitted assigns of the parties to this Agreement.

8.4    <u>Notices</u>.  Any notice or communication given pursuant to this Agreement by any of the parties to another party shall be in writing and delivered, either in person or mailed by registered or certified mail, postage prepaid (mailed notices shall be deemed given three (3) days after being duly mailed), as follows:

If to <u>Buyer</u>, as follows:                    If to <u>Seller</u>, as follows:

    Michael J. Tucker, Chairman              Roland A. Labine
    Peter H. Miller, President               President
    Restore Media, LLC                       Historical Trends Corporation
    1000 Potomac St., N.W.                   199 Berkeley Place
    Suite 102                                Brooklyn, NY  11217
    Washington, DC  20007

8.5    <u>Applicable Law; Entire Agreement</u>.  This Agreement shall be construed in accordance with the laws of the State of New York.  This Agreement and the Related Instruments contain the entire agreement between the parties with respect to the subject matter of this Agreement and supersede all prior agreements and understandings.

8.6    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same agreement.

8.7    <u>Entire Agreement; Schedules</u>.  This Agreement, including the Schedules referenced herein and attached hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior agreement or understanding, written or oral, between the parties.  The parties agree and acknowledge that each of the Schedules, as initialed by the parties, is an integral part of this Agreement.

*Signature Page Follows*

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first above written.

SELLER:

**HISTORICAL TRENDS CORPORATION**

By: _____, Pres.

Roland A. Labine, President

3/1/2002

BUYER:

**RESTORE MEDIA II, LLC**

By: _____ 3-1-2002

Michael J. Tucker, Chairman

And: _____ 3-1-2002

Peter H. Miller, President

- 11 -

**SCHEDULE 1.2**

**Assets**

Assets shall include:

(i) all of Seller's right, title, and interest in and to the Publications in print, electronic or other media, including without limitation the Websites;

(ii) all contracts, leases of personal property, and other agreements listed on Schedule 2.3;

(iii) all licenses, permits, waivers, consents, approvals, orders, certificates and applications issued to or made by the Seller in connection with the Publications by a governmental authority, agency, or court of law;

(iv) all of Seller's right and title to and interest in the Publication Names, and all trademarks, service marks, trade names, trade address, domain names and copyrights or applications therefor, and all logos, existing promotional materials, know-how, look-and-feel, processes, confidential information and other intellectual and intangible property rights related to the Publications;

(v) all accounts receivable, prepaid postage and inventory relating to the Publications;

(vi) all advertising contracts (insertion orders) representing cancelable future orders relating to the Publications;

(vii) all books, files, records, and documents including, without limitation, subscription and advertiser lists for the Publications and all of the published content of the Publications including, without limitation, all electronically stored content;

(viii) all computer hardware, systems and software relating to the production and distribution of the Publications; and

(ix) all of the business and goodwill of the Publications as a going concern.

Assets shall not include Seller's library or Seller's 1987 Dodge Caravan.

**(Attachments)**

- 2 -

PURCHASE OF *CLEM LABINE'S TRADITIONAL BUILDING*,
*CLEM LABINE'S PERIOD HOMES* AND RELATED ASSETS
BY RESTORE MEDIA II, LLC ("BUYER") FROM HISTORICAL TRENDS CORPORATION

COMBINED BALANCE SHEET AS OF FEBRUARY 15, 2002

2/21/02

### ASSETS

| | |
|---|---:|
| CASH | $ 103,612.47 |
| ACCOUNTS RECEIVABLE - ADV | $ 421,590.05 |
| Less:  RESERVE FOR BAD DEBT | $(101,992.30) |
| ACCOUNTS RECEIVABLE - SUBS | $ 18,072.00 |
| PREPAID EXPENSES | $ 5,438.00 |
| PREPAID POSTAGE | $ 4,500.00 |
| OTHER CURRENT ASSETS | $ - |
| **TOTAL CURRENT ASSETS** | **$ 451,220.22** |

### LIABILITIES

| | |
|---|---:|
| ACCOUNTS PAYABLE | $ 351,761.52 |
| ACCRUED COMMISSIONS | $ 39,869.00 |
| ACCRUED PAYROLL | $ 13,623.00 |
| ACCRUED PAYROLL TAXES | $ 3,049.98 |
| DEFERRED ADV REVENUE | $ 33,595.64 |
| DEFERRED SUB LIABILITY | $273,872.32 |
| **TOTAL CURRENT LIABILITIES** | **$ 715,771.46** |
| | |
| **NET WORKING CAPITAL** | **$(264,551.24)** |

**Clem Labine Employment Agreement**

See attached.

# EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is entered into as of the 1ˢᵗ day of March, 2002, by and between RESTORE MEDIA II, LLC, a Delaware limited liability company with offices at 1000 Potomac Street, N.W., Suite 102, Washington, DC 20007 (together with its parent and affiliates, "the Company") and ROLAND A. LABINE ("Employee").

## RECITALS

A.   Employee is currently the President of Historical Trends Corporation ("HTC"), a New York corporation which owns and operates *Clem Labine's Traditional Building* and *Clem Labine's Period Homes* (the "Publications").

B.   In connection with the acquisition of the Publications by the Company pursuant to an Asset and Liabilities Purchase Agreement between the Company and HTC of even date herewith (the "Purchase Agreement"), the Company desires to employ Employee to continue managing the Publications, and Employee is willing to be so employed by the Company pursuant to the terms, covenants and conditions set forth in this Agreement.

**NOW THEREFORE,** in consideration of the mutual promises and covenants contained herein and for other good and valuable consideration, the receipt, sufficiency and adequacy of which are mutually acknowledged by each party, it is hereby agreed as follows:

1.   ***Duties.***  Subject to the terms of this Agreement, the Company hereby employs Employee as the Publisher and Editor, Marketing and Circulation Director, Database Manager and Systems Guy of the Publications.  Employee shall be responsible for managing the publishing operations of the Publications on a day to day basis and shall report directly to Peter H. Miller, so long as Mr. Miller is associated with the Company.  Employee hereby accepts employment by the Company upon the terms and conditions set forth in this Agreement.

2.   ***Term.***  The term of this Agreement shall commence on the Closing Date provided in the Purchase Agreement and shall continue for three (3) years.  Employee makes a firm commitment to the Company for one (1) year.  If the Company terminates this Agreement prior to the expiration of the first year, Employee shall be entitled to receive his Base Salary (as defined below), less withholdings, through the end of the first year.  After the end of the first year, either party may terminate this Agreement by giving thirty (30) days prior written notice to the other.  In the event of such termination by either party, Employee shall be entitled to receive only his Base Salary, less withholdings, through the effective date of termination, and shall not be entitled to any other compensation from the Company.

3.   ***Compensation.***

(a)   Salary. During the term of this Agreement, the Company shall pay Employee a gross salary of Fifty-Five Thousand Dollars ($55,000) per year (the "Base Salary"), less tax withholdings, payable in installments in accordance with the Company's regular payroll

239716.6

schedule, but in any event not less than once per month.  Salary for any partial payroll period shall be paid on a pro rata basis based upon the actual number of business days worked during such partial period.

(b)    <u>Benefits</u>.  During the term of this Agreement, Employee shall be eligible for the same benefits on substantially the same terms as the Company's other salaried senior employees. Such benefits shall include three (3) weeks annual paid vacation in the first year, and four (4) weeks annual paid vacation in each subsequent year.

(c)    <u>Expenses</u>.  Upon submission of expense reports and such other documentation as the Company may require, Employee shall be entitled to reimbursement within thirty (30) days for reasonable expenses actually incurred by Employee in furtherance of the Company's business.  Reimbursement of expenses shall be subject to the Company's expense reimbursement policies as they may be in effect from time to time.  The parties acknowledge that the Company does not currently have a written expense reimbursement policy, but that the Company intends to make reimbursements to Employee on substantially the same basis as to the Company's other senior executives.

4.    *Extent of Services*.  During the first two (2) years of this Agreement, Employee shall devote no less than forty (40) hours each week to the business of the Company and the performance of his duties hereunder; from the beginning of the third year and thereafter for the duration of this Agreement, Employee shall devote no less than thirty-five (35) hours each week to the business of the Company and the performance of his duties hereunder.

5.    *Business Location*.  Provided that the Lease between the Company and Historical Trends Corporation of even date herewith is in effect, Employee's office shall be located at 69A Seventh Avenue, Brooklyn, New York, throughout the term of this Agreement.

6.    *Termination*.  This Agreement will terminate as set forth in Section 2, or earlier upon Employee's death or the inability of Employee to perform all of his essential duties or responsibilities, as determined by the Company in good faith and in its reasonable discretion, for a period in excess of one hundred and eighty (180) days as a result of physical or mental illness, accident or injury, without prejudice to any rights Employee may have under the Americans With Disabilities Act, its state and local law counterparts or the Family Medical Leave Act.

7.    *Effect of Termination.*  Upon termination of this Agreement by either party, Employee shall promptly surrender to the Company all property in any way obtained by Employee or provided him in relation to the Publications.  This includes, but is not limited to, documents and property concerning customer lists, price lists, files, records, memoranda, notes, papers, and any other property, material and/or information of or pertaining to the Company or the Publications. The duties upon termination enumerated in this Section 7 are in addition to and shall not affect in any way the Employee Covenants contained in Section 8 of this Agreement.

8.    *Employee Covenants*.  Employee is employed by the Company in a position of trust in which Employee uses, observes and has access to "Confidential Information" (as defined below), and is provided with unique access to the Company's customers, advertisers, vendors, marketing strategy, financial and technical information, suppliers, and other confidential business information not generally known to the public.  To protect its Confidential Information,

- 2 -

competitive advantages and other legitimate business interests in this highly competitive environment, Employee agrees and covenants as follows:

(a)    <u>Non-Competition, Non-Solicitation and No Diversion of Business Opportunities or Prospects</u>. During the period in which Employee is actually employed by the Company and for three (3) years thereafter, Employee shall not:

(i)    engage in, or in any manner be connected or concerned with, directly or indirectly, as principal, agent, employee, officer, consultant, advisor or owner of any business operation engaged in the historic restoration market, including, without limitation, any and all publications, other media, and trade shows in such market ("Competitive Business");

(ii)    directly or indirectly solicit any customer, subscriber, advertiser or vendor of the Company or the Publications to cease or reduce its business with the Company or the Publications;

(iii)    directly or indirectly solicit, hire, employ or endeavor to employ or contract with any person then or previously employed by the Company or its related entities to join in any enterprise engaged in the Competitive Business; or

(iv)    divert from the Company any business opportunity relating to publications, media or trade shows in the historic restoration market.

(b)    <u>Confidentiality</u>.

(i)    During the term of this Agreement and following the termination of this Agreement, whether terminated by the Company or Employee, Employee shall not make any use, for his own benefit or for the benefit of any person, firm, business or entity (other than the Company) of any "Confidential Information" or knowledge, customer or supplier lists, or any other data of or pertaining to the Company or the Publications, its business and financial affairs, or its services not generally known within the Company's trade. Employee shall not communicate or divulge any such Confidential Information, knowledge, customer lists or other data to any person, firm, business or entity other than the Company or persons, firms, business or entities designated by the Company in writing.

(ii)    "Confidential Information" means commercial information not generally known within the Company's trade which is proprietary to the Company, including trade secret information about the Publications, operations, services, personnel, and organization, including information relating to customers, vendors, research, accounting, marketing, finance, business systems, processes and techniques, and also including all information disclosed to the Employee, or to which the Employee had access at any time during his employment, which the Employee or the Company has a reasonable basis to believe to be Confidential Information, and which is treated by the Company as being Confidential Information.

(c)    <u>Breach</u>. Employee and the Company each recognize and acknowledge that any violation of the covenants contained in this Section 8 is likely to cause irreparable harm to the Company and, therefore, the parties agree that, upon any threatened or actual breach of any covenant contained in this Section 8 by Employee, the Company may apply to any court of

- 3 -

competent jurisdiction to enjoin a violation, threatened or actual, of these covenants, in addition to any such other remedies the Company may have.

    (d)   _Acknowledgment_.  Employee acknowledges and agrees that the restrictions set forth in this Section 8 are supported by adequate consideration and are reasonable in scope and essential to the preservation of the Company's businesses and properties and that enforcement of these restrictions will not cause Employee any hardship, and because of Employee's background and experience, will not preclude Employee, in the event of Employee's termination of employment with the Company, from becoming gainfully employed in such a manner and to such an extent as will provide a standard of living for himself of at least the sort and fashion to which he has become accustomed.

    (e)   _Survival of Covenants_.  The covenants contained in this Section 8 shall survive the termination of this Agreement.

9.    **_Use of Name_**.  Employee hereby grants to the Company an exclusive license to use his name ("Clem Labine") in the three publications set forth below, so long as they are published by the Company in the United States of America.  Employee acknowledges, agrees, and consents to the Company's use of the following legends on its publications and related websites:

    _Old-House Journal:_          "Founded by Clem Labine, 1973"

    _Clem Labine's Traditional-Building:_   "Founded by Clem Labine, 1988"

    _Clem Labine's Period Homes:_     "Founded by Clem Labine, 2000"

10.   **_Miscellaneous_**.  Any notice required or permitted to be given under this Agreement shall be sufficient if in writing and delivered in person or sent by certified mail to Employee's residence (in the case of notice to Employee) or to the Company at its principal office (in the case of notice to the Company).  Each party hereto may change the address for delivery of notices hereunder by giving written notice of such change pursuant to the provisions hereof.  The Company and Employee each expressly agree and contract that it is not the intention of either party to violate any public policy, statutory or common law.  If any provision of this Agreement is determined by a court of competent jurisdiction to be unenforceable or invalid, in whole or in part, the parties hereto agree that such provision shall be deemed modified or restricted to the extent and in the manner necessary to render the same valid and enforceable, or shall be deemed excised from this Agreement, as the case may require, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provisions had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be.  Employee may not assign his rights or obligations under this Agreement without the written consent of the Company.  This Agreement contains the entire agreement of the parties and supersedes all oral and written agreements that have existed between the parties.  This Agreement may not be altered, amended or modified except by a further writing signed by Employee and the the Company.

_Signature page follows_

- 4 -

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first above written.

**ROLAND A. LABINE**                    **RESTORE MEDIA II, LLC**

_Roland A. Labine_

President

By: _Peter H. Miller_  3-1-2002

Title: PETER H. MILLER

PRESIDENT

- 5 -

January 5, 2007

## Clem's Personal Business News for 2007

Because of our long personal connection in the business, I wanted to bring you up to date on the latest developments in my personal business life.

On July 31, 2006 I ended my professional connection with Restore Media LLC after a number of policy differences. Thus I have no personal involvement with the two magazines that continue to bear my name on the masthead (due to contractual obligations).

So I am now embarking on the 4th phase of my business career. The first, at McGraw-Hill, ran from 1957 to 1972. The second phase, starting The Old-House Journal, ran from 1972 to 1987. The 3rd phase, the founding of Traditional Building and Period Homes magazines and websites, ran from 1988 to 2006.

And now, in the New Year of 2007, I am exploring how to translate my experience into a web-based business (isn't everyone?!?!?!) in association with some colleagues I've met along the way. I believe I have some unique insights into how to apply web technology to some unmet marketplace needs. The idea of starting a new venture has the creative juices flowing once again -- just as they were in 1972 when I left the safe cocoon of McGraw-Hill to strike out on my own.

It's exciting to be pushing the envelope yet again. The Old-House Journal was started by using basic typewriters to create a publication out of thin air. Moving along the technology curve, the development of Traditional Building magazine in 1988 was based on applying database publishing in an entirely new way. And I now believe we have a way to adapt web technology in a venture that will be every bit as innovative as my three magazines were when I founded them.

So, as I set sail on the seas of 2007, I hope the New Year finds you in good health and in possession of a serene frame of mind. I'll keep you posted on developments as they loom on the horizon.

All best regards for the New Year.

Clem

Clem Labine
Historical Trends Corporation
199 Berkeley Place
Brooklyn, NY 11217
rlabine@earthlink.net

January 11, 2007


To: John Corbett

Re: (1) RTE CATALOG Version 1.5
    (2) RTE CATALOG Version 2.0


Hi John --

I'm enclosing an HTC check for $3,500 as per our discussion.
The following should be noted:

* This is an outright grant to Meetinghouse Research Group
for Caputo services to implement an online version of the RTE
Catalog Version 1.5 that will be under your total control.
I'm attaching additional notes below on Version 1.5 and
Version 2.0 to make sure we're on the same page of music.

* This grant is being made in the hope and expectation that:

(a) RTE Catalog Version 1.5 will be of immediate benefit to
the overall sales development activities of Meetinghouse
Research Group.

(b) John & Clem will gain additional insights into the
essential features that we must incorporate into Version 2.0.

(c) Version 1.5 will be of immediate benefit in our ongoing
collective efforts to stick a large thumb in MJT's eye!


Cheers,




P.S.  Remember our Motto for 2007:

"LET's GIVE PARANOIDS SOMETHING TO BE PARANOID ABOUT!"


Encl: (1) Notes on Version 1.5
      (2) Notes on Version 2.0

RTE CATALOG VERSION 1.5

1. This is basically a Corbett-only venture, to be used primarily as a sales enhancement tool for Meetinghouse Research Group.

2. The $3,500 from HTC is a "no strings" grant to Meetinghouse Research Group.

3. RAL should not figure in the workflow for Version 1.5 -- since RAL's personal commitments in the 1st Q would prove an impediment to timely implementation.

However, RAL stands ready to advise and consult on Version 1.5 all along the way should such input be helpful.

4. Version 1.5 should be set up using RTE's existing 200 category "NetCodes."

5. Simultaneously, RAL will be working on adapting the ARCON Codes for Version 2.0 -- and synchronizing "NetCodes" with the new set of Version 2.0.  See further 2.0 notes below.

6. Corbett should attempt to load as many listings as possible from his existing databases into Version 1.5 to enrich content and attract Search Engine notice.

7. Version 1.5 should be a real-time, real-world learning experience for Version 2.0.

SOME THOUGHTS ON RTE CATALOG VERSION 2.0

1. When it comes time to spend out-of-pocket money on Version
2.0, Corbett and Labine will sit down to negotiate specific
terms, a "prenup," if you will.

The general concept is that Labine is willing to invest $$$$
and some time in Version 2.0, if Corbett is willing to invest
"sweat equity" time.  RAL would then expect some equity
participation -- probably minority participation.

It's possible that to do this cleanly, the RESTORATION TRADES
EXCHANGE might have to be incorporated as a separate entity,
with Corbett owning X shares and RAL Y shares.

2. As soon as possible, RAL will start work on the Coding
system for Version 2.0.   RAL's thought is to start with the
existing ARCON Categories and:

(a) See where there is direct equivalency between RTE
NetCodes and ARCON codes (e.g., "Bellhangers")..

(b) Where the RTE NetCode is too "lumpy" (i.e., too broad and
general), RAL will determine how many of the ARCON codes
should be subsumed under that NetCode.  All this will be set
up in a database for easy analysis and export.

(c) There will undoubtedly be some ARCON Codes that have no
RTE NetCode equivalent.   This is easily handled.

3. It is anticipated that the companies coded for the Version
2.0 database will have to be coded BY HAND by RAL & JC.
Corbett's important customers will get lots of coding TLC;
the freebies will get only a few preliminary codes -- with
the expectation that some of them will log on and edit their
own codes.  (Note: We will need a limit on freebie codes, to
prevent the greedy from asserting they do everything.)

4. Because of (3), it is critical that Version 2.0 have a
website database that RAL can edit & code from the Bat Cave.

5. Like the ARCON website, Version 2.0 must be capable of
loading a pre-existing ASCII file database.

6. RAL is already collecting new companies for freebie "seed" listings in a database to be loaded into Version 2.0.

7. When it comes time to launch version 2.0, we can consider the merits of personal branding of the website.  Right now, RAL thinks there might be some benefit to:

John Corbett's & Clem Labine's
RESTORATION  TRADES  EXCHANGE

(a) This has the benefit of putting a human face on yet another new mysterious cyberspace website.

(b) Should Time & Tide take their toll on RAL, the "Labine" can be dropped at some point, and the "John Corbett" would still be there -- having already established brand recognition.

**Network** **Solutions**.



# WHOIS Search Results

### WHOIS Record For

IMAGE NOT
AVAILABLE

**restoration-trades-exchange.com**

Services from Network Solutions:

Certified Offer Service - Let us help you get this domain name!
SSL Certificates - Get peace of mind with a secure certificate.
Site Confirm Seals - Display a security seal and gain visitor trust.

=-=-=-=
Visit AboutUs.org for more information about RESTORATION-TRADES-EXCHANGE.COM
AboutUs:
RESTORATION-TRADES-EXCHANGE.COM

Registration Service Provided By: Positronic Design
Contact: hosting@positronicdesign.com
Visit: http://www.PositronicDesign.com

Domain name: RESTORATION-TRADES-EXCHANGE.COM

Administrative Contact:
  Positronic Design
  David Caputo (hosting@positronicdesign.com)
  +1.4135870011
  Fax: +1.4132800554
  903 Dwight St.
  Holyoke, MA 01040
  US

Technical Contact:
  Positronic Design
  David Caputo (hosting@positronicdesign.com)
  +1.4135870011
  Fax: +1.4132800554
  903 Dwight St.
  Holyoke, MA 01040
  US

Registrant Contact:

**Need More Info?**
Contact us today

CALL 1-800-361-571

CONTACT m



Search »

Positronic Design
David Caputo (hosting@positronicdesign.com)
+1.4135870011
Fax: +1.4132800554
903 Dwight St.
Holyoke, MA 01040
US

Status: Active

Name Servers:
   dns1.name-services.com
   dns2.name-services.com
   dns3.name-services.com
   dns4.name-services.com
   dns5.name-services.com

Creation date: 16 Nov 2006 13:53:41
Expiration date: 16 Nov 2008 13:53:41
=-=-=-=
The data in this whois database is provided to you for information
purposes only, that is, to assist you in obtaining information about or
related to a domain name registration record. We make this information
available "as is," and do not guarantee its accuracy. By submitting a
whois query, you agree that you will use this data only for lawful
purposes and that, under no circumstances will you use this data to: (1)
enable high volume, automated, electronic processes that stress or load
this whois database system providing you this information; or (2) allow,
enable, or otherwise support the transmission of mass unsolicited,
commercial advertising or solicitations via direct mail, electronic
mail, or by telephone. The compilation, repackaging, dissemination or
other use of this data is expressly prohibited without prior written
consent from us.

We reserve the right to modify these terms at any time. By submitting
this query, you agree to abide by these terms.
Version 6.3 4/3/2002
The previous information has been obtained either directly from the registrant or a registrar
of the domain name other than Network Solutions. Network Solutions, therefore, does not
guarantee its accuracy or completeness.

Show underlying registry data for this record

| Current Registrar: | ENOM, INC. |
| IP Address: | 69.25.142.9 (ARIN & RIPE IP search) |
| IP Location: | US(UNITED STATES)-WASHINGTON-BELLEVUE |
| Record Type: | Domain Name |
| Server Type: | IIS 6 |
| Lock Status: | ok |
| Web Site Status: | Parked |
| DMOZ | no listings |
| Y! Directory: | see listings |
| Secure: | No |

**BUY THE AVAILABLE EXTENSIONS FOR THIS DOMAIN NAME**

| restoration... | ☑ | .net |
| restoration... | ☑ | .org |
| restoration... | ☑ | .info |
| restoration... | ☑ | .biz |
| restoration... | ☑ | .tv |
| restoration... | ☑ | .us |
| restoration... | ☑ | .cc |
| restoration... | ☑ | .ws |
| restoration... | ☑ | .bz |
| restoration... | ☑ | .vg |
| restoration... | ☑ | .gs |
| restoration... | ☑ | .tc |
| restoration... | ☑ | .ms |

Continue »

**SEARCH AGAIN**

Enter a search term:

e.g. networksolutions.com

**Search by:**
◉ Domain Name
○ NIC Handle
○ IP Address

Search

**E-commerce:** Not available
Case 1:07-cv-00573-RJL     Document 1-6     Filed 03/23/2007     Page 3 of 6
**Traffic Ranking:** Not available
**Data as of:** 14-Jun-2005



**Need to get your business online?**
Our professional designers can build a custom Web site for your business.
$49.95/month, plus a $399.00 design fee



**PerformanceClicks™ from Network Solutions**
Create and manage your online advertising from as low as **$125/month** plus **$99 one time set-up fee**

---

Domain Names  |  Web Hosting  |  Web Design  |  SSL Certificates  |  Sell Online  |  Email Security  |  Pay Per Click  |  Online Marketing
Design a Website  |  Search Engine Optimization  |  Custom Logo Design  |  Press Release Services  |  Email Account  |  Web Analytics

   

"An outstanding customer service experience"
J.D. Power and Associates

© Copyright 2007 Network Solutions. All rights reserved.

**Network Solutions**

Your cart is empty



# WHOIS Search Results

## WHOIS Record For



**IMAGE NOT AVAILABLE**

### restorationtradesexchange.com

Services from Network Solutions:

<u>Certified Offer Service</u> - Let us help you get this domain name!
<u>SSL Certificates</u> - Get peace of mind with a secure certificate.
<u>Site Confirm Seals</u> - Display a security seal and gain visitor trust.

=-=-=-=
Visit AboutUs.org for more information about RESTORATIONTRADESEXCHANGE.COM
<u>AboutUs:</u>
<u>RESTORATIONTRADESEXCHANGE.COM</u>

Registration Service Provided By: Positronic Design
Contact: hosting@positronicdesign.com
Visit: http://www.PositronicDesign.com

Domain name: RESTORATIONTRADESEXCHANGE.COM

Administrative Contact:
   Positronic Design
   David Caputo (hosting@positronicdesign.com)
   +1.4135870011
   Fax: +1.4132800554
   903 Dwight St.
   Holyoke, MA 01040
   US

Technical Contact:
   Positronic Design
   David Caputo (hosting@positronicdesign.com)
   +1.4135870011
   Fax: +1.4132800554
   903 Dwight St.
   Holyoke, MA 01040
   US

Registrant Contact:

**Need More Info?**
Contact us today

CALL 1-800-361-571

CONTACT m

Search

Positronic Design
David Caputo (hosting@positronicdesign.com)
+1.4135870011
Fax: +1.4132800554
903 Dwight St.
Holyoke, MA 01040
US

Status: Active

Name Servers:
dns1.name-services.com
dns2.name-services.com
dns3.name-services.com
dns4.name-services.com
dns5.name-services.com

Creation date: 16 Nov 2006 13:53:41
Expiration date: 16 Nov 2008 13:53:41
=–=–=–=
The data in this whois database is provided to you for information
purposes only, that is, to assist you in obtaining information about or
related to a domain name registration record. We make this information
available "as is," and do not guarantee its accuracy. By submitting a
whois query, you agree that you will use this data only for lawful
purposes and that, under no circumstances will you use this data to: (1)
enable high volume, automated, electronic processes that stress or load
this whois database system providing you this information; or (2) allow,
enable, or otherwise support the transmission of mass unsolicited,
commercial advertising or solicitations via direct mail, electronic
mail, or by telephone. The compilation, repackaging, dissemination or
other use of this data is expressly prohibited without prior written
consent from us.

We reserve the right to modify these terms at any time. By submitting
this query, you agree to abide by these terms.
Version 6.3 4/3/2002
The previous information has been obtained either directly from the registrant or a registrar
of the domain name other than Network Solutions. Network Solutions, therefore, does not
guarantee its accuracy or completeness.

Show underlying registry data for this record

| | | |
|---|---|---|
| Current Registrar: | ENOM, INC. | |
| IP Address: | 69.25.142.15 (ARIN & RIPE IP search) | |
| IP Location: | US(UNITED STATES)-WASHINGTON-BELLEVUE | |
| Record Type: | Domain Name | |
| Server Type: | IIS 6 | |
| Lock Status: | ok | |
| Web Site Status: | Parked | |
| DMOZ | no listings | |
| Y! Directory: | see listings | |
| Secure: | No | |

BUY THE AVAILABLE EXTENSIONS
FOR THIS DOMAIN NAME

restoration... ☑ .net
restoration... ☑ .org
restoration... ☑ .info
restoration... ☑ .biz
restoration... ☑ .tv
restoration... ☑ .us
restoration... ☑ .cc
restoration... ☑ .ws
restoration... ☑ .bz
restoration... ☑ .vg
restoration... ☑ .tc
restoration... ☑ .ms

Continue »

SEARCH AGAIN

Enter a search term:

e.g. networksolutions.com

Search by:
◉ Domain Name
○ NIC Handle
○ IP Address

Search

E-commerce: Not available
Traffic Ranking: Not available
Data as of: 14-Jun-2005

Case 1:07-cv-00573-RJL     Document 1-6     Filed 03/23/2007     Page 6 of 6



**Need to get your business online?**
Our professional designers can build a custom Web site for your business.
$49.95/month, plus a $399.00 design fee





**PerformanceClicks™ from Network Solutions**
Create and manage your online advertising from as low as **$125/month** plus **$99 one time set-up fee**

---

Domain Names | Web Hosting | Web Design | SSL Certificates | Sell Online | Email Security | Pay Per Click | Online Marketing
Design a Website | Search Engine Optimization | Custom Logo Design | Press Release Services | Email Account | Web Analytics







"An outstanding customer service experience"
J.D. Power and Associates

© Copyright 2007 Network Solutions. All rights reserved.

# WINSTON & STRAWN LLP

| | | |
|---|---|---|
| 35 WEST WACKER DRIVE<br>CHICAGO, ILLINOIS 60601-9703 | 1700 K STREET, N.W.<br>WASHINGTON, D.C. 20006-3817 | 333 SOUTH GRAND AVENUE<br>LOS ANGELES, CALIFORNIA 90071-1543 |
| 43 RUE DU RHONE<br>1204 GENEVA, SWITZERLAND | (202) 282-5000 | 200 PARK AVENUE<br>NEW YORK, NEW YORK 10166-4193 |
| BUCKLERSBURY HOUSE<br>3 QUEEN VICTORIA STREET<br>LONDON, EC4N 8NH | FACSIMILE (202) 282-5100 | 21 AVENUE VICTOR HUGO<br>75116 PARIS, FRANCE |
| | www.winston.com | 101 CALIFORNIA STREET<br>SAN FRANCISCO, CALIFORNIA 94111-5894 |

M. CARTER DELORME
(202) 282-5956
mdelorme@winston.com

March 12, 2007

**BY FACSIMILE AND FIRST CLASS MAIL**

Roland A. Labine
Historical Trends Corporation
199 Berkeley Place
Brooklyn, NY 11217

Re:      **Breach of Employment Agreement**

Dear Mr. Labine:

      Winston & Strawn LLP represents Restore Media, LLC with respect to a variety of matters, including transactional and employment issues. We have recently been made aware of some disturbing activities related to the sale of Traditional Building Magazine and its website, as well as your current professional activities, which need to be addressed promptly.

      As an initial matter, we received a letter sent by a William St. James, Esquire, counsel to Meetinghouse Enterprises, Inc. and John M. Corbett, its owner and President. Mr. St. James alleges that the Custom Building and Restoration Catalog (the "Catalog"), which has resided on the Traditional Building website prior to Restore Media's purchase of that website in 2002, is owned by Mr. Corbett and/or Meetinghouse. He further alleges that neither Mr. Corbett nor Meetinghouse has granted Restore Media, Traditional Building Magazine, or you a license to publish the Catalog on the Traditional Building website. He has demanded that the Catalog be removed from the website immediately.

      As you will recall, pursuant to Section 2.2.11 of the Asset and Liabilities Purchase Agreement ("Purchase Agreement") between Restore Media and Historical Trends Corporation ("HTC") under which Restore Media acquired Traditional Building magazine, you represented and warranted that HTC "has all right, title and interest in and to [its] Intellectual Property, and such Intellectual Property does not infringe or otherwise violate the intellectual property rights of any third party." If Mr. St. James' allegation that Mr. Corbett and/or Meetinghouse Enterprises owns the Catalog is true, you are in breach of the Purchase Agreement. It is Restore Media's position that it owns all right, title and interest in and to the Catalog by virtue of its acquisition of

**WINSTON & STRAWN** LLP

Roland A. Labine
March 12, 2007
Page 2

Traditional Building magazine and www.traditional-building.com. We trust that Mr. St. James is mistaken regarding his allegations; however, in order to resolve Mr. St. James' concern, please immediately produce any agreement, license or other written understanding between HTC and Meetinghouse which demonstrates that HTC had the appropriate right, title and interest to the Catalog to my attention.

In a potentially related matter, Restore Media has discovered that you and Mr. Corbett have entered into a transaction whereby you have associated yourself with Meetinghouse Research Group for the purposes of funding an endeavor which will be directly competitive with Restore Media. Specifically, it is our understanding that you have invested money and time into the RTE Catalog for an equity position in Restoration Trades Exchange. In addition, we understand that you will work on coding for the on-line version of RTE Catalog 2.0.

During the last few months of your employment, you, in conjunction with Mr. Corbett who served as a contractor of Restore Media, were responsible for heading up Restore Media's "Tradweb Services Directory" which provided the same services as the RTE Catalog, and, coincidentally, the Custom Building and Restoration Catalog. Therefore, we are confident that your are aware that the RTE Catalog and the Tradweb Services Directory are directly competitive projects.

If you recall, your Employment Agreement with Restore Media contains a "Non-Competition, Non-Solicitation, and No Diversion of Business Opportunities or Prospects" provision at Paragraph 8(a). It states in relevant part:

> During the period in which Employee is actually employed by the Company and for three (3) years thereafter, Employee shall not:
>
> (i) engage in, or in any manner be connected or concerned with, directly or indirectly, as principal, agent, employee, officer, consultant, advisor or owner of any business operation engaged in the historic restoration market, including, without limitation any and all publications, other media and trade shows in such market;
>
> (ii) directly or indirectly solicit any customer, subscriber, advertiser or vendor of the Company or the Publications to cease or reduce its business with the Company or the Publications; . . . or
>
> (iv) divert from the Company any business opportunity relating to publications, media or trade shows in the historic restoration market.

Base don our findings, the only rational interpretation is that your involvement in the RTE Catalog with Mr. Corbett and Meetinghouse Research Group places you as a principal, agent, consultant, advisor and/or owner of a business operation engaged in the historic restoration market. It is, therefore, the position of Restore Media that your aforementioned

**WINSTON & STRAWN** LLP

Roland A. Labine
March 12, 2007
Page 3

activities with Mr. Corbett and Meetinghouse Research Group constitute a breach of your Employment Agreement.

While we value our partnership with you in Restore Media's trade shows, your past contributions as an employee of Restore Media, and the success of your former publications as part of Restore Media's portfolio, we cannot ignore this flagrant breach of your commitments to the Company. We therefore demand that you immediately cease all plans to engage in the RTE Catalog project with Mr. Corbett and Meetinghouse Research Group, and to certify under the penalty of perjury that you have (1) ceased such activities and (2) will not engage in any competitive activity prior to August 1, 2009, pursuant to the terms of your Employment Agreement. Given the exigent nature of this situation, we expect to see such written certification from you no later than Friday, March 16, 2007.

Should you decline to certify that you will adhere to the terms of your Employment Agreement and provide us with the appropriate written assurances of your intent or not respond to me at all before Friday, March 16, 2007, we will be forced to file suit to protect Restore Media's legitimate business interests and request that you be enjoined from violating the terms of your Employment Agreement. In addition, we will pursue legal action against Mr. Corbett and Meetinghouse Enterprises for tortious interference with contractual relations, as well as the breach of contract claim against you. We hope that we do not need to seek judicial assistance in remedying this situation.

Finally, we believe that you have retained on your home personal computer certain customer databases which are the property of Restore Media. Specifically, we believe those databases include, but are not limited to, the Period Homes ("perhomes") database and the Traditional Building database "companies". These databases were compiled by and kept for the exclusive benefit of Restore Media. Paragraph 8(b)(i) of your employment agreement states that:

> During the term of this Agreement and following the termination of this Agreement, whether terminated by the Company or Employee, Employee shall not make any use, for his own benefit or for the benefit of any person, firm, business, or entity (other than the Company) of any 'Confidential Information' or knowledge, <u>customer or supplier lists</u>, or any other data of or pertaining to the Company or the Publications . . .

The databases on your personal computer unquestionably fall into the category of "customer or supplier lists." Accordingly, Restore Media demands that you allow its Information Technology consultant Dorian Henao access to your home computer to identify any Restore Media information contained thereon, and to permanently delete those files from your personal computer. In your communication responding to this letter, please provide some dates and times prior to March 23, 2007 to allow for these files to be removed from your computer.

**WINSTON & STRAWN** LLP

Roland A. Labine
March 12, 2007
Page 4

Thank you for your kind attention to this matter, and we look forward to hearing from you soon.

Sincerely,

M. Carter DeLorme

cc:    William St. James, Esq.
        Michael J. Tucker
        John Mason, Esq.